Ulysses E. **WILLIAMSON**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 16067.

United States Court of Appeals Ninth Circuit.

Jan. 9, 1959.

Howard R. Lonergan, Portland, Or., for appellant.

C. E. Luckey, U. S. Atty., George E. Juba, Robert R. Carney, Asst. U. S. Attys., Portland Or., for appellee.

Before DENMAN, Senior Circuit Judge, and POPE and HAMLIN, Circuit Judges.

DENMAN, Senior Circuit Judge.

Ulysses E. Williamson, hereafter appellant, appeals from his conviction by a jury in the District Court for the District of Oregon on nine counts of dealing in narcotics in violation of 26 U.S.C. §§ 4705(a) and 4704(a), and 21 U.S.C.A. § 174.

The nine counts of which appellant was found guilty rose out of three transactions which occurred on September 21, 22 and 24, 1957, wherein appellant delivered certain amounts of heroin to one Gooder, a federal narcotics agent. Appellant was charged with the following three counts as to each transaction: (1) Selling narcotics not in pursuance of a written order form [26 U.S.C. § 4705 (a)], (2) selling narcotics not in or from an original stamped package [26 U.S.C. § 4704(a)], and (3) receiving, concealing, and facilitating the transportation and concealment of narcotics [21 U.S. C.A. § 174].

At the trial, narcotics agent Gooder testified as follows: He was introduced to the appellant on September 21, 1957, by one George Williams, at Williams' home in Portland, Oregon. Appellant drove Gooder from Williams' home to his own home in another part of the city. There appellant gave Gooder some capsules wrapped in cellophane in return for $50 in government advance funds.

The second transaction took place the following day, on September 22, 1957. Gooder arranged by telephone to meet appellant in the men's room of a Portland bus station. Gooder waited there until appellant entered and placed a package of capsules in the coin return slot of a public telephone. Gooder took them out and paid appellant $50.

The third meeting was on September 24, 1957. Gooder arranged by telephone to meet appellant at a Portland bus ter-

minal "to take care of [Gooder] for three". They again met in the washroom. Appellant placed his package in the telephone coin return box. Gooder removed it and arrested appellant. On none of the three occasions did Gooder present appellant with a government order form, and on no occasion to Gooder's knowledge did the capsules come from an original stamped package. A government chemist testified that all three sets of capsules contained heroin.

Appellant's defense was that he was either entrapped or was not a seller but a "purchasing agent". Testifying in his own behalf, he admitted that on the three occasions charged he delivered heroin to Gooder and received payment from him. However, he claimed that he had done so because Gooder had told him he had a girl friend who was a narcotics addict and was at the time in need of heroin. He testified that he happened to know that George Williams (the government informer) had some heroin, and that he had, merely as a favor to Gooder, purchased heroin from Williams and taken it to Gooder, because Williams refused to deal directly with Gooder and that he had made no profit on the sales. He contradicted Gooder's testimony on the following points: First, appellant stated that they had first met not through Williams but by accident, at a bar. Second, when the first exchange occurred, he did not have the heroin in his home, as Gooder testified, but he had had to drive to Williams' house to get it. Finally, while Gooder testified that he had arranged the exchanges simply by announcing to appellant, in effect, "I need more," appellant's version was that Gooder had accompanied his requests with moving descriptions of the hardships of his addicted girl friend "up in Kelso". Appellant also described a narcotics addict he had once seen in the throes of "withdrawal symptoms", to indicate the source of his charitable impulses toward Gooder's girl friend "up in Kelso".

The lower court sent the case to the jury with the following relevant instructions:

"If, in connection with Counts I and II, you find that the defendant was not a dealer or seller of narcotics, but obtained the narcotics at the request of Mr. Gooder from George Williams, and that the defendant was only acting as an agent for Mr. Gooder and without any profit to himself, then the defendant would not be guilty of selling or giving away any narcotics, and your verdict should be in favor of the defendant. I leave it up to you to determine whether in Counts I and II the defendant was acting as the agent of Mr. Gooder and not as a seller of narcotics to Mr. Gooder; and if you find that he was merely the agent and did it as a Good Samaritan or as a friend without any profit to himself and that he got the narcotics from George Williams merely to help him out, then he would not be guilty of the offenses charged in Counts I and II."

The jury, rejecting appellant's testimony, returned a verdict of guilty on all counts. Appellant urges on this appeal that the lower court erred as follows: (1) in limiting appellant's cross-examination of the government narcotics agents; (2) in excluding certain expert testimony offered by appellant; (3) in stating to counsel, before the jury, that the issue in the case was whether appellant sold narcotics to somebody; (4) in denying appellant's motion for acquittal; (5) in striking certain words from the indictment prior to giving it to the jury.

■ The lower court did not err in limiting appellant's cross-examination of government witnesses regarding their relation with George Williams. Three government narcotics agents, Gooder, Wolski and Eck, who had participated in appellant's apprehension, testified at the trial. On cross-examination of agents Gooder and Wolski, appellant asked questions designed to clarify the role which Williams, the government informer who had "set up" appellant, had taken in the three exchanges of narcotics. The lower court

ruled that this line of questioning was irrelevant.

Assuming that the defense of entrapment was raised below (although no instructions on the defense were requested), according to appellant's version of the transactions Williams could have been a participant in the entrapment. Appellant testified that he originally arranged for Gooder to obtain the narcotics directly from Williams, and only became involved in the transactions when Williams refused to deal except through the appellant. If this were true, and if Williams were acting as an agent of the government, it would undoubtedly have amounted to an entrapment. The relationship between the government agents and Williams was therefore relevant.

However, the government contends that the appellant lost his right to object to the lower court's ruling by failing to indicate this relevancy at trial. At the time of the ruling, appellant had not yet testified. Gooder's testimony was merely that Williams had introduced him to appellant. Thus at that point the questions had no apparent relevancy. The lower court was justified in refusing to permit them without some explanation by appellant. United States v. Easterday, 2 Cir., 1932, 57 F.2d 165. Counsel for appellant neither explained his theory of the facts at that time, nor, after appellant's testimony had introduced into the trial the question of Williams' role in the sales, did he attempt to recall agents Gooder or Wolski.

■■ The lower court did not err in cutting off the testimony of appellant's expert witness, Dr. David. Dr. Norman A. David, a pharmacologist, testified to a number of matters on behalf of appellant. He told of methods of manufacturing heroin from morphine and described the "withdrawal symptoms" of a drug addict and the treatment given addicts at an Oregon State hospital. The lower court ruled that his testimony was irrelevant and ordered it disregarded by the jury. It subsequently ruled that the jury might consider it.

Since the court finally permitted the jury to consider Dr. David's testimony, any error in striking the testimony initially was cured. Moreover, the testimony was properly stricken. Appellant claimed that Dr. David's testimony as to "withdrawal symptoms" was relevant as corroboration of appellant's previous testimony regarding the addict he had seen in the grip of such a withdrawal. Since appellant's own testimony was clearly irrelevant—the fact that he was sympathetic toward needy addicts in general was no defense—the doctor's corroboration of that testimony was also irrelevant. Counsel also urges that Dr. David's testimony would have corroborated appellant by showing that he could not have known whether or not Gooder was an addict simply by looking at him. However, appellant never testified that he thought Gooder was an addict, but that Gooder wanted the drug for his girl friend up in Kelso. The corroboration was thus irrelevant on this ground as well.

■ Appellant's principal contention regarding the testimony of Dr. David is that it was improperly *terminated*, because if allowed to continue the doctor would have supported appellant's position at trial that the samples of heroin contained no more than $\frac{1}{8}$ grain per ounce, that the heroin was manufactured from morphine which came from stamped packages, and that it was legally dispensed by appellant "as medicine" pursuant to 26 U.S.C. § 4702. This novel theory of defense was never suggested to the lower court as a ground for permitting Dr. David to testify further. Appellant should not be permitted to establish the relevancy of his evidence by urging for the first time on appeal that he was proceeding below on a highly unique theory of defense which he concealed throughout the trial from the lower court. The testimony was properly terminated.

■ Appellant contends that the lower court erred in stating to counsel in the course of argument on the admis-

sibility of Dr. David's testimony in the presence of the jury, "The question in this case is did this man sell narcotics to somebody. That is the issue." Regardless whether this statement standing alone was error, the court's instructions to the jury correctly expanded it to cover the applicable law. We do not regard it as error but if it were it was harmless error.

■ Appellant also contends that the lower court erred in denying appellant's motion for acquittal. He first urges that entrapment was established as a matter of law. However, the only evidence of entrapment was the appellant's own testimony, which the jury was free to disbelieve. It is highly questionable whether, even if believed, appellant's testimony revealed entrapment. It is significant that no instruction on such a defense was requested by appellant below.

■ Next, appellant urges that the government's failure to call the informer Williams "must be assumed likewise to show entrapment." The contention is frivolous. Appellant's own witness, Vranizan, testified that he had heard a week and a half prior to trial that Williams had gone to Wyoming. There was no showing that the government had any control over his actions.

■ Appellant next contends that the statutory presumption of knowledge of wrongful importation (21 U.S.C.A. § 174) could not be employed in this case because appellant was unfairly prevented from introducing evidence in rebuttal. The alleged unfairness lay in the claim that the government suppressed informer Williams' testimony and in the lower court's rulings regarding appellant's cross-examination of the narcotics agents and his direct examination of Dr. David. None of these contentions, as discussed above, are supported by the record.

Finally, appellant urges that he was merely surrendering heroin to federal agent Gooder pursuant to 18 U.S.C. § 1402, providing for the surrender of heroin "lawfully possessed" prior to July 18, 1956, within 120 days subsequent to July 18, 1956. The transfers in this case occurred in September, 1957. The contention is frivolous.

■ The lower court did not err in striking certain words from the indictment. Prior to trial, appellant moved that the prosecution be required to elect which elements of the offense, as charged in the indictment in the language of the statutes, it intended to rely on. The prosecution elected at that time to disregard the following words:

In Count II, which charged that appellant did unlawfully purchase, sell, dispense and distribute a quantity of narcotic drugs, etc., the word "purchase".

In Count III, which charged that appellant did unlawfully receive, conceal, buy, sell and facilitate the transportation, concealment and sale of a quantity of a narcotic drug, etc., the words, "buy", "sell" and "sale".

In Count V, which charged that appellant did unlawfully purchase, sell, dispense and distribute a quantity of narcotic drugs, etc., the word "purchase".

In Count VI, which charged that appellant did unlawfully receive, conceal, buy, sell and facilitate the transportation, concealment and sale of a quantity of a narcotic drug, etc., the words "buy", "sell" and "sale".

In Count VIII, which charged that appellant did unlawfully purchase, sell, dispense and distribute a quantity of narcotic drugs, etc., the word "purchase".

In Count IX, which charged that appellant did unlawfully receive, conceal, buy, sell and facilitate the transportation, concealment and sale of a quantity of a narcotic drug, etc., the words "buy", "sell" and "sale".

Following the trial, the ensuing colloquy took place between the court and counsel with reference to striking the words now in issue:

"Counsel for Appellant: I would like to object to the indictment and the exhibits going to the jury on the ground I believe the jury should examine the exhibits in the courtroom,

and the indictment should not go to them under the common law rules, which I believe are the rules of the Federal Court.

"I would also further object that if the indictment goes to them it would be misleading in the absence of the election that was made.

"The Court: Do you want those portions to be obliterated?

"Counsel for Appellee: Why don't we send the notice of election together with it? There is in the file a separate notice of election.

"The Court: I would do that, or I would strike the wording.

"Counsel for Appellant: It might be better to strike.

"The Court: All right; have you any objection?

"Counsel for Appellee: No."

The indictment with the above words stricken was given the jury. Counsel for appellant thus acted under Rule 7(d) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., providing:

"(d) Surplusage. The court on motion of the defendant may strike surplusage from the indictment or informations."

The appellant contends that though Rule 7(d) was created by the Supreme Court it nevertheless is still bound by that court's decision in Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849. On the contrary, the change in the indictment there was on the motion of the prosecution and the court 121 U.S. at pages 9 and 10, 7 S.Ct. at pages 785 and 786, specifically held that the error of the trial court was that the stricken matter was held to be "surplusage", while in fact without it the Grand Jury well might not have brought any indictment at all.

So also is distinguishable our opinion in Carney v. United States, 9 Cir., 163 F.2d 784, 788, where the text was amended to charge a different offense. No question of surplusage was raised. Our opinion in Stewart v. United States, 9

Cir., 12 F.2d 524 was decided in 1926 before the Federal Rules of Criminal Procedure with its Rule 7(d) were adopted.

The judgment is affirmed.